The next batter is number 191161, Robert James Beach v. New Brunswick S. R. W. Co. Ltd. Mr. Keech, I believe you're on. Thank you, Your Honor. Good afternoon. Good afternoon. May it please the Court, Robert Keech with Bernstein Shore on behalf of the Appellant to State Representative for the Post-Effective Data State of Montreal, Maine and Atlantic Railway Ltd. The issue on this appeal is the proper standard to be used in affording priority to certain claims incurred by the railroad debtor within six months of its Chapter 11 petition pursuant to 11 U.S.C. Section 1171B, which carries forward the Court's authority to afford such priority from railroad equity receiverships, including under the so-called six-month rule or six-month claim doctrine. We agree with the appellees that the starting point for this analysis or the starting points for this analysis are this Court's opinions in the Boston and Maine case, but also specifically the U.S. Supreme Court cases upon which they rely, principally Fosdick, Miltonberger and Gregg. Properly read, as consistent with Miltonberger and Gregg, the standard articulated in Boston and Maine clearly bars affording 1171B priority to the claims of the appellee Irving Railroads. The standard, however, that was used by the bankruptcy court below, which was purportedly taken from those same Boston and Maine decisions, but we think mistakenly, and which would afford such priority, frankly, to any expense of an operating railroad within a six-month period, is directly contrary to the requirements of Miltonberger and, frankly, especially Gregg. If the standard below were, in fact, the standard, if, in fact, Boston and Maine had articulated such a standard, it did not, Boston and Maine would have to be overturned, frankly, as inconsistent with Miltonberger and Gregg. What is that standard? The standard requires a number of things, but most importantly, what it requires- I think you don't need to, because I think Boston and Maine- I think that test, properly read and applied, is consistent with Miltonberger and Gregg. The standard, as articulated by Boston and Maine, is that the service, or good purchased, must be such that it is indispensable to the operation of the railroad. In other words, that the continuation of the railroad as a going concern would be threatened if, in fact, that payment were not made. In fact, Miltonberger says precisely that. Gregg says precisely that. And Boston and Maine court wasn't attempting to do anything other than apply those two decisions. The court will recall that what was at issue in the lower court in Boston and Maine, at least in the case that eventually ended in the 634 F. Second opinion, what was at issue there was whether or not the FOSDIC requirements were essential to six-month rule treatment. In other words, what the district court found in that case was that it wasn't going to designate a class of six-month rule claims or allow any priority to any such claims because there had been no diversion of income to the benefit of the mortgagees, and there was also no surplus fund from which those amounts could be paid. And under the Supreme Court's decision in FOSDIC, those were requirements for affording six-month rule priority. Do you agree that there are three tests for the six-month rule to apply? In all candor, Your Honor, I don't. But I don't think... Do you agree with Boston and Maine? I don't, and I think in Boston and Maine's treatment of the majority opinion in Gregg is interesting. It essentially likes to pretend it's not there. But I... Let me ask them. Sure. Slightly different. Do we, as a panel, have to go along with whatever Boston and Maine says, whether you agree with the right or wrong or not? I don't think you do, but I also don't think it's necessary to overturn it in order to get where we want to go. In other words, I certainly think this Court could revisit that opinion as being inconsistent with Gregg, but I'm not requiring... You're not required to go there to rule in our favor. Because I think, again, I think you have to read Boston and Maine in the context of the fact that it was applying Milton Berger and Gregg. What happened was the opinion came up, and the only thing that happened below was the you therefore can't get this treatment. What the Boston and Maine opinion in the First Circuit said was, we think there's another way to get there, and we think that there is a receivership principle in Milton Berger that can be applied to afford six-month rule priority in the event that the FOSDIC terms are not... Or the FOSDIC conditions are not met. And what are the requirements of that Milton Berger receivership principle, and consistent with Gregg? Well, the requirements are that non-payment of the amount must lead to the cessation of an essential business relationship, the termination of which would result in the railroad shutting down. In other words, ending its status as a going concern. Both Milton Berger and Gregg and every other Supreme Court opinion to apply the six-month rule, including the circuit court cases, have emphasized that this is a special circumstances. The doctrine is to be applied with great care. The First Circuit in concluding BNM said this was a very strict standard to be met. It's not a test that's supposed to result in every single operating expense that's incurred in the six-month period being afforded a special priority. There are a couple of reasons for that. If you afford the claims a special priority and they have to be paid, you make railroad reorganization impossible. But more to the point, you may also, even in a railroad liquidation, result in diluting the strength of genuine six-month rule claims like wages, for example. As one of my colleagues before the Bankruptcy Bar is fond of saying, if you make all administrative claims, none of them are. If everybody has a special priority, there is no special priority, and you have diluted that priority for critical wages and critical supplies, which are the quintessential six-month rule claims. The reason these claims, which are classic interchange claims, they arise out of the practice of railroads, of essentially handing off the cars as they enter new and different railroad's tracks to that railroad for transportation across those tracks to the eventual destination. And that series of interchanges results in a series of claims against and claims for that are reconciled by the system at issue in this case. But the reason those claims can never, frankly, satisfy Milton Berger and Gregg, as the Penn Central Court found, is that today, unlike at the time of Milton Berger, today a railroad cannot refuse to interchange even if there's non-payment. In other words, the Montreal, Maine, Atlantic did not have to pay in advance in order to have this interchange occur. It occurred as a matter of law and regulation, and they couldn't refuse to do so. Therefore, they don't meet the first and essential test of Milton Berger and Gregg. They couldn't actually not provide this service. Non-payment would not have prevented it from happening, and we would have had the interchange regardless. So they can't get across the threshold. These two cases are the birthplace of what's called the modern critical vendor doctrine, as recently recognized in the Supreme Court's Jevick opinion. In a critical vendor context, a court can't authorize a debtor in possession or a trustee to pay a critical vendor if, in fact, the debtor is able to compel the performance without payment. So, for example, when there's a contract, I can, under modern bankruptcy doctrine, compel performance by the counterparty on the contract even without paying pre-petition amounts due. In this case, they were compelled to do so. Therefore, it never would have been a critical vendor status. Secondly, the evidence below here established unequivocally, and the appellee doesn't seriously contend, that this service was not essential to maintaining the railroad as a going concern. We operated the railroad without traveling over their lines. We operated the railroad without interchanging with them. I operated this railroad without interchanging with them. And more to the point, we sold the railroad as a going concern to an entity which operates the railroad without interchanging with the Irving Railroads. This was never a service that was essential to maintaining the railroad status as a going concern. Therefore, it can't meet the test of Milton Berger. It can't meet the test of Gregg, which I think actually says that what you have to look at is whether payment of the service, not the kind of service, but whether payment of the service. And therefore, it can't meet the test of Boston and Main Railroad. Boston and Main does not stand for the proper, yes? This is the way I understand whether a claim qualifies as a six-month claim under Boston and Main. And I'm quoting from the case number one, it represents a current operating expense necessarily incurred. Are we in with that? Correct. Are we? Yeah. You have to help me otherwise I will be confused forever. No. That is the first step of the Boston Main Standard. The second one. It was incurred within six months before the reorganization petition was filed. Is that the case? Let me go back to your first point. What I was agreeing with you on was that's the first element of the standard. These claims don't meet the first element of the standard. They were not necessarily incurred. The necessarily incurred language in Boston and Main is a direct reference to the test of Milton Berger and Gregg, which says that necessarily incurred means it was necessary to pay for this service in order to prevent a cessation of the service and the demise of the railroad as a going concern. Excuse me. So you don't agree with the first? They did not meet the first standard. The second one. Was it incurred within six months before the reorganization petition was filed? Yes, that was stipulated to. Okay. And three, the goods or services were delivered in the expectation that they would be paid out of current operating revenues of the railroad, not in reliance on the general credit. Yeah. That test was not met here either. So the first and the third? Not met. And as to the latter, I'll be brief about that. But as to the latter, the reason for that is twofold. That test requires that there be no reliance on the general credit of the railroad. And cases have consistently refused to afford six-month rule status to claims where there is any security device being employed and where the credit terms suggest a very long-term extension of credit. In this case, there was a security device conceded by the witnesses for the railroads to have been, in fact, the equivalent of collateral. The Irving Railroads also are affiliated with the Irving Paper Companies, and in this case, the railroad provided service to the Irving Paper Companies. The paper companies would owe the Montreal Main Atlantic Railroad money. At the same time, MMA owed the Irving Railroads money. Irving Railroads used their control over the paper companies, or their common control with their paper companies, to set up a triangular set-off mechanism where they refused to allow paper company money to be released until they were paid by the railroad. That's a non-ordinary course structure. And under the case law, if it's not an ordinary course trade claim incurred on a short-term credit basis, it can't be a six-month rule claim because that's not reliance on the immediate cash flow of the railroad. With respect to the credit extension issue, the Irving Railroads clearly extended credit. When Montreal Main Atlantic started hauling oil and was being paid on a much slower basis through the system, essentially by Canadian Pacific as the originating carrier, the parties renegotiated their agreement and entered into an agreement where the credit terms were 60 days and more. There is no case that I am aware of or have been able to find since the institution of the doctrine where somebody who's getting 60-day credit terms gets six-months treatment. The doctrine was intended for parties who were relying on the short-term cash flow of the business, the kinds of parties who get paid weekly, like wages, the kinds of parties whose maximum terms are net 30, like suppliers of fuel and ties and rails, not for the kinds of long-term credit arrangements that these parties entered into when MMA essentially acted as a collection agent for the railroad. In short, you don't need to go beyond Boston and Maine, the three-part test you articulated, to deny these claims. Because first, the necessarily incurred test incorporates Milton Berger and Gregg's requirements that non-payment must lead to the cessation of a critical business relationship which would result in the demise of the railroad. And last, its requirement that there not be any reliance on the general credit of the railroad was violated both by the security arrangement and by the lengthening of the credit period to 60 days under a formal contract. Accordingly, under the authority of Boston and Maine, and most specifically those cases upon which it relies at the Supreme Court, this decision must be reversed. Thank you. I'm sorry. No problem. Mr. LePen. Yes. Thank you, Your Honor. Alan LePen, on behalf of New Brunswick Southern Railway and Maine Northern Railroad, also referred to in these proceedings as the Irving Railroads. Your Honors, I believe that- How is this necessarily incurred? How is this necessarily incurred? These are interline claims with respect to the interchange of freight between these two railroads. Is counsel correct that you legally could not have declined to transport? That is not accurate, Your Honor. Under federal railway law, railroads are required to accept the interchange of freight. But as a condition of doing that, they are entitled to require advance payment. In this case, advance payment would have been not feasible because the MMA was not generating sufficient cash flow to be able to make an advance payment. That is the very reason why the oil shipments were carved out of the cash swap arrangement, by virtue of their lack of liquidity. And so, necessity on that basis is established. If the Court were to look at Southern Railway v. Flournoy, which is a Fourth Circuit decision cited in our papers, that is precisely a point that the Court raised in that situation. Let me also, on the necessity test, because if one looks at Boston and Maine- All right. So if they had declined to use your line, what would have happened? You wouldn't have participated in the transportation because you did not require upfront payment. Your Honor, what is significant here is that, as the trustee described in the disclosure statement that was filed in the bankruptcy case, this particular line, and these are his words, not mine, were a critical rail artery between Montreal and St. John, New Brunswick. That this line was an important component of the transportation system, served customers along the line that relied upon that rail transportation. When you look at the necessity requirement, I think you need to look at it from the perspective of the customers that rely upon rail service. And to not have interconnected with the MMA would have impaired and made it very difficult, obviously, for the members of the public, the shippers, the customers, the consumers who rely upon rail service. That's what the necessity test is all about. And the point that I would stress- But you're saying in a bankruptcy proceeding, for an unsecured creditor, that critical equates to necessity. In the case of a railroad reorganization, the continued performance of transportation service and the needs of the customers who rely on that translates to necessity. The Boston and Maine decision makes it clear that the necessity test is really a generic test. What the court in Boston and Maine said, and it was relying upon Milton Berger, is that you look to see whether the claim falls within a class of claims that are indispensable to the performance of transportation services. And Milton Berger- And what's your class? Excuse me? What's your class? Interline, the interline carriers. These are interline claims. The Milton Berger case in particular- All interline claims? I believe all interline claims would satisfy the test of necessity by reason of the fact that a railroad cannot operate if it is unable to interchange freight with those carriers with whom its lines interconnect. The fact whether this railroad could have otherwise operated without connecting to the Irving railroads is really not the factor. The factor is whether these interline claims constitute a class of claims that are indispensable to the continued performance of transportation service. And what Milton Berger tells us is that these, the interline claims do qualify. And that was stressed in the Boston and Maine decision where the court specifically said and used it as an example of a class of claims that were necessary for the continued performance of transportation service and satisfied the test. The Boston and Maine case and Milton Berger cited two examples of classes of claims that satisfy the necessity test. One was labor because of the disruption that would be caused by a labor shortage. And the other were interline claims because of the disruption in carrying freight. And the disruption that that would have on the public and the consumers who rely upon continued transportation. So I would submit on that basis alone, before you get to any of the underlying facts, that on that basis alone, these claims satisfy the test of necessity. But on top of that, you had all of the evidence that was presented to the bankruptcy court. And after all, these are findings of fact. They can only be overturned if this court comes to that strong unyielding belief that the bankruptcy court made a mistake in its findings of fact. The evidence here is overwhelming in that regard. Again, based largely on the representations that were made by the trustee himself, characterizing this as a critical rail artery between Maine and Montreal, St. John and Montreal, that specifically identified the various producers of consumers, chemicals, paper, agricultural commodities that were serviced by this particular line. And in addition to that, the importance of this particular line to the overall financial resources of the MMA. The MMA, by reason of the shipment of oil over this particular freight line during the two years leading up to the bankruptcy, had benefited from a dramatic increase in revenue. They were shipping 500,000 barrels of oil a month, which resulted in a dramatic increase in their revenue prior to the unfortunate derailment that occurred. When you look at all of that evidence, put aside my contention that I think, again, the interline claims satisfy the test because they are a class that is indispensable to the performance of transportation services. But when you look at all of the evidence that was before the bankruptcy court, I don't think there is any basis to say that the court's findings in that regard were clearly erroneous. They are supported by substantial evidence that was presented in the court below. The sole legal issue, I believe, that was identified in this appeal by the trustee, and he hasn't referred to that in the argument, perhaps he's prepared to abandon it, is he made the argument that interline claims were ineligible as a matter of law from being accorded six-month priority. Again, I think Boston and Maine absolutely puts that issue to rest. You already articulated the test that must be satisfied in order to qualify for some six-month priority status, and interline claims... What do you have to say in answer to your colleague that the first and third legs are not met? Well, the first is the necessity. I think we've discussed that. The latter is whether the services were provided with the expectation of payment out of current operating revenue as opposed to reliance on the railroad's general credit. I think, again, the facts were clear. There are two separate arrangements, and let me back up for a second because Boston and Maine, I think, provides guidance with respect to that particular issue. What the court said in the Boston-Maine decision, that if the transaction had any credit terms, so recognizing there could be an extension of credit here, were they, and now quoting from Boston and Maine, compatible with a general expectation of payment from current receipts or indicated reliance on the railroad's general credit? Mr. Keech has indicated that he's not aware of any case where there was extensions of credit similar to the terms that existed in this case. I would refer the court to Southern Railway v. Carnegie Steel, which is cited in our papers. That case involved 90- to 120-day notes, and yet the court found, ultimately, that the services were provided with the expectation of payment from current operating revenue. That is the case in our situation as well, because we had two separate arrangements. One was oil shipments. Of our $2.1 million claim, $1.6 million relates to amounts owed with respect to services provided in connection with oil shipments. And the agreement that was reached between the parties is that when the MMA received payment from the interline settlement system for all of the freight charges that it had billed, which included freight charges owed to the Irving Railroads, it would promptly pay the Irving Railroads their share of the payments that were received from the interline settlement system. That was a specific agreement that was reached, and the agreement provided that they would turn that over money promptly, and in any event, in no more than five days from the time they received it. And that, in fact, is what was done. They received payment from the interline settlement system. That included a portion of that included the charges that were owed to the Irving Railroads, and they immediately remitted that payment to us. That is the, those are the facts on which the bankruptcy court found, that that was an expectation of payment from current operating revenue, not reliance on the general credit worthiness of the MMA. Again, I think that, that finding is clearly supported by the evidence. With respect to the non-oil shipments, there was what Mr. Keech has talked about, the cash swap arrangement that was in place. That was initiated in 2003. Its purpose, and this is in the evidence, in the record, was to avoid reliance on MMA's general credit. It was not a set-off arrangement, and there was testimony to that effect, that in order to effectuate a set-off, there would have had to have been all kinds of accounting transactions, because there were more than two parties involved. And the credit officer for the Irving Railroads said he just felt that would be too messy. This was a cash swap arrangement. Parties would determine, again, what Irving Paper Companies, an affiliated company, owed to the MMA for freight services that had been provided, and the MMA would determine what was owed to the Irving Railroads for the services that it provided, and on a weekly basis, on the same day, they would exchange wire transfers. Now, it was on that arrangement, from the current operating revenue of the MMA. It's interesting, if you look at the trustee's initial brief at page 44, he really seems to concede as much, where he says, and I'm quoting, the facts clearly demonstrated that the Irving Railroads relied in respect of local traffic, and that's the non-oil shipments, on the Irving Paper Companies cash flow. They relied on the, may I finish, Your Honor? Relied on the Irving Paper Companies cash flow, which benefited the Irving Railroads via the swap arrangement. Well, the cash that flowed from the Irving Paper Companies was the operating revenue of the MMA, and the operating revenue of the Irving Paper Companies, and so this was done on a regular basis, weekly basis. This was the expectation of the parties. This was not reliance on the general credit worthiness of the MMA. This was an expectation of payment from current operating revenue. That's the test in the Boston main decision. Hang on. Yes. Was this an actual wire transfer, or was this just an accounting mechanism? No, these were actual wire transfers. Of money? Of money. Okay. Thank you.